## Waggner v. Waggner, Appellant.

383

Argued October 24, 1933.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Louis F. McCabe,* for appellant.

*Thomas H. Lee,* and with him *J. Louis Breitinger,* for appellee.

Opinion by Cunningham, J., March 3, 1934:

Eva S. Waggner, respondent below, has appealed from a decree in divorce granted her husband, Benjamin G. Waggner, upon the ground that she wilfully

and maliciously deserted him on December 17, 1927, and persisted therein until the filing of his libel on January 29, 1932.

The parties were married on April 17, 1926, and lived together only twenty months. Libellant was then about fifty-six and respondent fifty; he was a widower with five adult children, three of whom had homes of their own and two, Ruth, aged twenty-six and Ben, twenty-three, lived with him; she was a spinster with an independent income from investments made while engaged in the millinery business.

Libellant owned his home at 3140 North Park Avenue, Philadelphia, and earned a salary of $215 per month. There is no suggestion in the testimony that libellant, prior to the date of the separation, was remiss in the performance of his obligations as a husband and father, but there is evidence that friction developed from two sources.

Ruth and respondent seem to have been unable to arrive at a satisfactory adjustment of domestic affairs, the entertainment of their respective friends, and the joint use of the home. The former, who was employed during the day, made arrangements to live elsewhere, but respondent, in order to comply with libellant's wishes, urged her to remain. Then, too, acrimonious discussions relative to their respective social positions and financial resources arose between the parties.

Libellant testified: "My wife had the idea that she had married very much below her station, although prior to our marriage I had her in my home no less than twenty times, and she observed my home and my family and the general atmosphere of my home and mode of living. After the marriage she told people she had married beneath her station and she was constantly lording it over everybody because she had money, and she claimed she was absolutely independ-

ent of everybody and every one, saying she could go out and earn $125 a week. Then she ridiculed my salary and my position, saying there was something wrong with me or I wouldn't be connected with one concern so long. ...... This nagging took place even in church. While we were in church she called me a hypocrite, in an undertone, for attending church. When we were away on pleasure trips, at Atlantic City, Syracuse, Niagara Falls or Chicago—I have taken her around to all these places on pleasure trips—she was constantly nagging and fault finding.''

A detailed discussion of the more than two hundred printed pages of testimony is unnecessary. Admittedly, respondent left the home on Saturday, December 17, 1927, and during the following week removed all her clothing and personal effects to the home of a married sister. The whole case comes down to the question whether her withdrawal was without cause or consent and amounted to a desertion, as contended by libellant, or was because he had ordered her out of the house, as asserted by respondent. We are obliged to reach our independent conclusion from testimony that is irreconcilably conflicting.

It had been arranged that respondent was to go that afternoon with her sister to visit their uncle in Media until Sunday evening or Monday morning. Libellant's version of the circumstances under which respondent left their home reads: ''Q. What was the last conversation you had with her before she deserted you? A. She had just accused me of having married her for her money. I asked her if she was serious. She said, 'Yes.' I said, 'I don't know how we are going to get along together with that idea in your head, my knowing it is absolutely false, I don't see how we can get along.' ...... Q. Everything was all right up to a certain hour, which just preceded the time she left? A. Yes, sir. Q. What hour did she

leave? A. I judge it was between 2 and 2:30 in the afternoon. Q. What brought about this discussion as to her statement that you had married her for her money? A. I can't recall anything that brought it up. That was not the only time she said that. That was one of her habits. ...... Q. That led to an argument as to whether you had really done that or not? A. Yes, sir. Q. How long did that last then? A. Not more than five minutes. It was very short. ...... Q. How did she come to leave? A. The heat of the argument had apparently cooled off when her sister drove up in front of the house in her automobile for the purpose of taking Mrs. Waggner to her uncle's in Media. Q. Had that been arranged? A. Yes, sir. Q. She knew that you knew that her sister was coming for her to take her to her uncle's? A. Yes, sir. Suddenly, when my wife saw her sister drive up in front of the door she ran out to the front door, threw it open and hollered out into the street, 'Ben has ordered me out of the house. Ben has ordered me out of the house.' Q. What did you say in response to that? A. Her sister came in and said, 'Did you order Eva out of the house?' I said, 'I don't think I have to discuss affairs between my wife and myself with you. I don't think there is any necessity for that.' Then her sister said, 'I will see she doesn't come back.' With that they went out and got in the automobile. By the Master: Q. Did your wife hear that remark by her sister? A. Yes, she couldn't help hearing it. Q. Did you deny having ordered her out of the house or did you admit it? A. Only to that extent. I didn't admit it, nor did I—it had been quite evident long before that that my wife was waiting for an opportunity when she could get out with the rights to sue me and probably draw alimony. Q. Why had you reason to think that? A. Because she was constantly saying that she had married beneath her station, that

I had brought her to a back alley—Park Avenue she called a back alley—and because she had talked several times over the telephone to people about making me pay her when she left, such things as that."

Respondent gave this account of the discussion: "Then I said, 'I can't see that you have the slightest respect for me, treating me in the manner you are treating me.' I said, 'I am commencing to think just what my friends have told me that you married me for what I have.' He said, 'That is a lie. Get out. I want you to get out.' I said, 'Do you mean that? This is the second or third time you have told me that. Do you mean it?' I was on my knees at the chair, crying at the same time. I said, 'If you mean it, I will go.' He said, 'I can get a room somewhere. I will go get a room somewhere but the fire has to be kept up, I won't have any plumbing bills, I don't want any frozen pipes.' With that the door bell rang and my sister came in. ...... She said, 'I am in a hurry, hurry up, hurry up. I can't come in.' I said, 'You must come in, I am in trouble.' With that she walked in, and whatever Mr. Waggner said to her she has told you. ........ Q. Was it your intention at that time to return to the home if such return was possible? A. If it had been agreeable. Q. To who? A. To both parties."

When we inquire whether libellant's story is corroborated, we find Jean Devlin, an apparently disinterested witness, testifying to a conversation with respondent in the course of which she said "she left the home because she couldn't tolerate Ruth, that she was independent and didn't have to take anything from anybody and she left the home of her own accord."

A neighbor testified the married life of the parties was "a little turbulent," and that in a conversation between the witness and respondent a few days after

the separation respondent complained "that Mr. Waggner was a man very much beneath her station and she had a favorite expression that Mr. Waggner was not a gentleman, but just had a little veneer."

Another witness stated respondent "was continually complaining and nagging" and "one of her favorite expressions was she had dragged him up out of the gutter, and they were living in an alley and she wasn't used to living in that manner."

Upon the question of offers of reconciliation, libellant testified that on the Tuesday following her withdrawal and while respondent was packing her property in the cellar he went to her and said, " 'Eva, you don't have to leave here. You don't have to do this.' She said, 'If you want to talk to me about that you will have to talk to Mr. Swartley, my lawyer.' "

Libellant testified as follows with respect to an interview in the spring of 1928: "Q. What was the reason for talking to her then? A. I imagine we both felt a little kindly towards one another. As I put her on the car I kissed her and told her there was nothing in our way of settling our trouble."

His cross-examination upon this point reads: "Q. You never offered at any time to provide a home for your wife separate and apart from the rest of your family, apart from Ruth? A. There was never any question as to that. Q. You never had a home prepared which your wife could have gone to where she would have been free of the presence of Ruth? A. No, I never did. That question never came up. Q. When you said that, 'There is nothing between us,' didn't you know as a matter of fact that there was a good deal between you particularly the way Ruth had treated your wife? A. I told her there was nothing between us that couldn't be patched up, eliminated."

Respondent's testimony was that she had always

been desirous and hopeful of a reconciliation, but libellant never made a bona fide effort to have her return.

Referring to various conversations which never resulted in any definite propositions, she said: "A. The third time was when he told me again—he walked home with me. He met me on Broad Street and walked as far as the front of the house with me that day. Q. During that walk did you have any conversation about living together? A. No, sir. Q. Did you ask him? A. No; I didn't think it was my place, after I was told to go. Q. Did he ever see you after that? A. Yes. Q. When was the fourth time? A. He told me he would come and talk to me. I was in hopes that would fix things up. I was in hopes when he said he would talk to me it was this talk that would fix things up."

The testimony upon this branch of the case is not as clear and positive as it should be, but we think there is more than a doubtful balance. Its weight is to the effect that libellant was sincerely desirous of resuming cohabitation and had a home to which it was respondent's duty to return. Her attitude was rather one of insisting upon the removal of conditions to which she objected but with which she was thoroughly familiar prior to her marriage.

The case is not free from difficulty. Different inferences might reasonably be drawn from the testimony bearing upon the controlling issues, but, after consideration of the entire record, a majority of the members of this court are of opinion that the conclusion expressed in the opinion, written for the court below by McDevitt, P. J., to the effect that libellant met the burden of proof required in a case of this kind, is in accordance with the fair weight of the evidence.

Decree affirmed.